IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

RONALD RUSSELL,

                                    Plaintiff,                    Case No. 3:07 CV 3216

            -vs-
                                                                 MEMORANDUM   OPINION

NATIONAL AMUSEMENTS, INC.,

                                    Defendant.
KATZ, J.

        This matter is before the Court on Defendant's motion for summary judgment (Doc. 33),

Plaintiff's response (Doc. 43), Defendant's reply (Doc. 47), and Plaintiff's sur-reply (Doc. 51).

This Court has jurisdiction pursuant to 28 U.S.C. § 1332.  For the reasons that follow, Defendant's

motion is denied.

## I. Background

        Plaintiff Ronald Russell ("Russell") has asthma and rheumatoid arthritis. Despite Russell's

attempt to mitigate his asthma symptoms by using an inhaler four times a day and a nebulizer

every other day, he still experiences daily complications.  (Russell Aff. ¶¶ 5, 6, 8, 11).  Russell

cannot do household chores, exercise, perform yard work, or maintain any physical hobbies.  (*Id.*

at ¶¶ 12-14).  He must avoid certain physical activities, like climbing stairs, as well as other

things, like temperature changes, which can trigger an asthma attack.  (Russell Dep. pp. 105, 176).

Dr. John Winder ("Dr. Winder") treats Russell for his asthma.  (Russell Dep. pp. 121-22).

        In 2000, Russell was diagnosed with rheumatoid arthritis, and currently receives treatment

from rheumatologist Dr. Michael Gordon ("Dr. Gordon").  As a result of his two impairments,

Russell has difficulty sleeping.  He must sleep in a recliner and often has to rely on his nebulizer to fall asleep.  (Russell Aff. ¶¶ 14-17).  Despite this, he still wakes up every few hours. (*Id*.).

Russell began working for Defendant National Amusements ("NA") in December, 1996. (Russell Dep. pp. 45-46).  NA is a Maryland-corporation in the business of running movie theaters. After two years as a part-time, hourly employee working the concession stand at Franklin Mall 6 Cinema, District Manager James Belcher ("Belcher") promoted Russell to the position of support manager.  (Russell Dep. pp. 45-46, 5254).  Russell has worked as a support manager at five different NA movie theaters, but since May, 2005,  has worked exclusively at Maumee Cinemas ("Maumee"). (*Id*. at 97-98, 123; 249-250).

Support managers are cross-trained to work four different shift assignments – the safe, booth, TIMS, and concession shifts.  (Belcher Dep. pp. 178; Allen Dep. pp. 65, 79).  When assigned to the safe shift, support managers are responsible for petty cash, making up the bank for ticket sales, and ensuring that the bank bags are ready for the Brinks courier.  (Allen Dep. pp. 57-65; Belcher Dep. p. 204).  When assigned to the booth shift, support managers work in the projection booth, thread film projectors, build up and tear down films, and start films in a timely manner.  (Russell Dep. pp. 61-62).

At Maumee, Russell found the booth shift to be a difficult assignment due to the theater's physical layout and rigorous film schedule.  (Russell Dep. p. 147).  Unlike the other NA theaters, Russell had to climb an 18-foot staircase to access the projectors, with only five minutes to move from booth to booth.  (*Id*. at 112-16, 124-25).

On May 18, 2005, approximately two weeks after his transfer to Maumee, Russell disclosed his physical impairments to his supervisor,  Maumee Managing Director Elena Allen

2

("Allen"), and requested that he work only two booth shifts a week with 48-hours in between.  (*Id.* at 147)  Allen indicated that she would try to accommodate Russell, but could not guarantee it. (*Id.* at 148-49).  On May 28, 2005, Russell repeated his accommodation request.  (*Id.* at 154-55).

In June, 2005, Russell received a poor employment evaluation, the last page of which noted pay increases.  In response, Russell submitted a letter to Allen and Belcher, stating:  "I am considerably older than most managers and have two illnesses (asthma and Rheumatoid Arthritis) that hinder the speed at which I do things. This is not to say that I am not capable for learning, I just may not move quite as fast as a 22-year-old."  (Belcher Dep., Exh. 12).  After receiving this letter, Allen and Maumee House Manager, Brett Biggs ("Biggs"), placed Russell under a 90-day evaluation period.  (Belcher Dep. 114, 121-22, Exh. 13; Allen Dep. pp. 107-08; Biggs Dep. 116-17).

Russell continued to seek his requested reasonable accommodation.  In August, 2005, Russell slid a note from Dr. Winder under Allen's door, stating that Russell should use his own judgment to limit his physical activity when appropriate, as climbing stairs could aggravate his asthma.  (Allen Dep. pp. 85; Plaintiff's Exh. 18).  Allen told Russell that NA needed a more detailed explanation of his specific limitations, so Russell sent a letter to all of his physicians, describing his daily workload and Maumee's physical layout, and asking them to describe his physical limitations.  (Allen Dep. pp. 83-86; Russell Dep. p. 183, Exh. L).  In this letter, Russell asked his physicians to support his request to work only one booth shift each week, and if he had to work two booth shifts, to limit each shift to five hours.  (Russell Dep. p. 194).

On December 27, 2005, Russell gave Belcher a second letter from Dr. Winder, dated November 22, 2005.  (Russell Dep. Exh. U).  Dr. Winder stated that Russell must limit his

physical exertion, and his exposure to particulates in the air and extreme temperatures. (*Id*.). However, the letter also opined that Russell should be able to work his assigned shifts, so long as he takes a 45-minute to one-hour break every three hours. (*Id*.). Allen, in response, authorized Russell to break and request help from another support manager when necessary. (Allen Dep. p. 101).

On December 29, 2005, Russell gave Allen a letter from Dr. Gordon, dated October 31, 2005, stating that Russell should only work one, five-hour booth shift each week. (Russell Dep. p. 199; Exh. N.). Belcher told Russell that Dr. Gordon needed to provide more detailed information about Russell's specific limitations. (Allen Dep. p. 92; Belcher Dep. p. 173). Russell tried to schedule an appointment with Dr. Gordon, and on January 26, 2006, emailed Belcher to inform him of this. (Russell Dep. 223, Exh. T). Dr. Gordon's nurse contacted NA and asked it to submit a list of exactly what it needed from Dr. Gordon to accommodate Russell, but NA never responded. (Belcher Dep. p. 178; Russell Dep. p. 220; Exh. 23).

On January 21, 2006, Russell became dizzy, stumbled, and blacked out at work. (Russell Dep. 231-32, Exh. 1). Around this time, Belcher told Russell that he would not enforce any accommodation unless Russell underwent a complete physical exam. (Russell Dep. pp. 216-25, Exh I). Russell never underwent such a test, however, because Dr. Gordon refused to perform it, explaining that the test was too dangerous for someone in Russell's condition. (Russell Dep. 216-25, Exh. I).

On August 7, 2006, as Russell reconciled the safe during his safe shift, Concessions Manager Shondie Clingaman ("Clingaman") asked him to make up a bank for concessions. (Russell Dep. p. 239). Russell initially objected to this task as unnecessary, but eventually

4

stopped his safe shift duties to fulfil Clingaman's request.  (*Id*.).  By the time Russell finished, Clingaman told him that it was no longer necessary.  (*Id*.).  Russell was unable to balance the safe that evening, and believed this was due to Clingaman's disruption, so he placed a note in the safe with this explanation.  (*Id*. at 240-41).  Angered by Russell's note, Clingaman filed a complaint with Belcher.  (Russell Dep. p. 242, Exh. X, Belcher Dep. p. 205).  Belcher, Allen, and co-manager Rik Griffin ("Griffin")  investigated Clingaman's complaint.  On August 19, 2006, they met with Russell, and  asked him to write a statement describing the incident from his perspective before he left work that day.

Toward the end of their investigation, Belcher, Allen, and Russell met again on September 9, 2006.  What took place at this meeting is contested by the parties.  According to Belcher and Allen, after they questioned Russell as to when and where he drafted his statement, Russell screamed "who do you think you are," pounded the table with his fists, and threw documents. (Belcher Dep. pp. 232-35; Allen Dep. pp. 103-06).  They claim that Belcher asked Russell to leave, and Russell did, but only after Belcher repeated the command three more times and threatened to call security.  (*Id*.).  Russell, however, denies that he engaged in this behavior. (Russell Dep. pp. 247-49).  Instead, Russell contends that he submitted paperwork about his rights under the ADA, including his right to a reasonable accommodation.  (*Id*.).

After this meeting, Belcher forwarded a memo of events, from his perspective, to Steve Horton, the Vice President of Operations at the Home Office, and sought permission to terminate Russell's employment. (Belcher Dep. pp. 243-44; Exh. 49).  On September 11, 2006, Belcher and Allen terminated Russell's employment.  (Russell Dep. p. 250; Belcher Dep. pp. 273-76; Exh. 57).

5

From January, 2006, to September, 2006, NA assigned Russell to one booth shift for thirteen weeks, two booth shifts for sixteen weeks, and three booth shifts for four weeks.  (Exh. M)     On September 20, 2007, Russell filed this lawsuit in the Lucas County, Ohio, Court of Common Pleas under Ohio's disability anti-discrimination statute, Ohio Revised Code § 4112.02(A).  On October 19, 2007, NA removed the case to this Court.

## II. Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id*. at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.*

6

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Rather,

Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of

evidentiary material in support of its position.  *Celotex*, 477 U.S. at 324; *see also Harris v.*

*General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).  Summary judgment must be entered

"against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

*Celotex*, 477 U.S. at 322.

  "In considering a motion for summary judgment, the Court must view the facts and draw

all reasonable inferences therefrom in a light most favorable to the nonmoving party."  *Williams v.*

*Belknap*, 154 F.Supp.2d 1069, 1071 (E.D.Mich.2001) (citing *60 Ivy Street Corp. v. Alexander*, 822

F.2d 1432, 1435 (6th Cir. 1987)).  However, " 'at the summary judgment stage the judge's

function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v.*

*U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court

is not required or permitted ... to judge the evidence or make findings of fact."  *Williams*, 154

F.Supp.2d at 1071.  The purpose of summary judgment "is not to resolve factual issues, but to

determine if there are genuine issues of fact to be tried."  *Abercrombie & Fitch Stores, Inc. v. Am.*

*Eagle Outfitters, Inc.*, 130 F.Supp.2d 928, 930 (S.D.Ohio 1999).  Ultimately, this Court must

determine "whether the evidence presents a sufficient disagreement to require submission to a jury

or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S.

at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### III. Discussion

Russell alleges that NA violated Ohio Revised Code § 4112.02(A) by unlawfully terminating his employment, failing to accommodate his disabilities, and retaliating against him. Because R.C. § 4112.02(A) is "virtually identical" to the ADA, *Sadinsky v. EBCO Mfg. Co.*, 730 N.E.2d 395, 398 (Ohio Ct. App. 1999), the Court can "look to regulations and cases interpreting the [ADA] for guidance." *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 207 (Ohio 1998); *see*, *e.g.*, *Bukta v. J.C. Penney Co.*, 359 F.Supp.2d 649, 671 (N.D.Ohio 2004).

### A. Unlawful Termination

Under Ohio law, it is unlawful "[f]or any employer, because of the ... disability ... of any person ... to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. § 4112.02(A).

In order to establish a *prima facie* case of disability discrimination in the employment context, a plaintiff must show that he: (1) is disabled; (2) can safely and substantially perform the essential functions of the job; and (3) experienced an adverse employment action, at least in part, because of his disability. *Id.*; *McGlone*, 697 N.E.2d at 206.

When the plaintiff has established a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1184-85 (6th Cir. 1996); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n.*, 421 N.E.2d 128, 132 (Ohio 1981).

If the employer does so, the burden shifts back to the plaintiff to prove that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *see also Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1095 (6th Cir.1996); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990); *Monette*, 90 F.3d at 1186; *Plumbers*, 421 N.E.2d at 132.

Here, Plaintiff has successfully established a *prima facie* case because: (1) Plaintiff's asthma substantially limits his major life activity of breathing; (2) Plaintiff can safely and substantially perform the essential job functions of a support manager; and (3) Defendant terminated Plaintiff, at least in part, because of his disability.  Although Defendant proffered a legitimate, nondiscriminatory reason for Plaintiff's termination, namely, insubordinate conduct, Plaintiff sufficiently created a genuine issue of material fact as to whether that reason was pretext for unlawful discrimination.  As a result, the Court denies Defendant's motion on this claim.

### 1. *Prima Facie* Case

#### a. Disability

An individual is "disabled" under Ohio law if he has: (1) a physical or mental impairment that "substantially limits" at least one "major life activity,"; (2) a record of such an impairment; or (3) been regarded by his employer as having such an impairment.  R.C. § 4112.01(A)(13).

A plaintiff is "substantially limited" if he is either "unable to perform a major life activity that the average person in the general population can perform" or "significantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general

population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(1).  To make this

determination, the Court must conduct an individualized inquiry, considering the impairment's

nature and severity, duration or expected duration, as well as the impact of corrective measures.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83, 119 S.Ct. 2139, 2147, 144 L.Ed.2d 450

(1999).

      Russell asserts that he is disabled because his asthma and rheumatoid arthritis substantially

limit his ability to breath and sleep.  Russell also contends that NA regarded him as having a

learning disability.

      Courts have found asthma and rheumatoid arthritis to be impairments, *Riforgiato v.*

*Findlex Corp.*, No. 3:02CV7053, 2003 WL 21303416, at *2 (N.D.Ohio May 8, 2003) (asthma);

*Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719, 726 (6th Cir. 2000) (arthritis), and

breathing and sleeping to be major life activities. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696,

704 (6th Cir. 2008) (breathing); *Verhoff v. Time Warner Cable, Inc.*, Nos. 07-4265, 07-4348, 2008

WL 4691794, at * 3 (6th Cir. Oct. 24, 2008) (unpublished disposition) (sleeping).  Thus, this case

turns on the extent of Russell's limitations.

### i. Breathing

      Russell's asthma prevents him for participating in a wide-range of activities; he must avoid

cigarette smoke, temperature changes, certain physical activities, outdoor activities, sports, and

household chores.  Limitations of this breadth are far greater than those experienced by the

average person, and as such, Russell has established a genuine issue of material fact as to whether

his breathing is substantially limited.  *See Albert v. Smith's Food & Drug Ctrs, Inc.*, 356 F.3d

1242, 1250-51 (10th Cir. 2004) (denying summary judgment because plaintiff's asthma required

10

her to avoid crowds, nighttime or outdoor activities, cigarette smoke, and perfumes, that her asthma was activated by an array of common substances including pollen, mold, dust, cat dander, dog hair, strong smelling paint, aftershave, certain kinds of foods, cleaning agents, and chemicals); *Bond v. Sheahan*, 152 F. Supp. 2d 1055, 1065 (N.D. Ill. 2001) (denying summary judgment because plaintiff's asthma precluded her from participating in many activities that she enjoyed outside of the workplace, such as dancing, jumping rope, volleyball, and badminton).

Russell's case is distinguishable from those where courts found individuals with asthma to lack a substantial limitation in breathing, because Russell cannot participate in physical activities, cannot be around cigarette smoke, and suffers limitations outside of the workplace.  *See Ventura v. City of Independence*, No. 95-3582, 1997 WL 94688, at * 1-2 (6th Cir. Mar.4, 1997) (unpublished) (granting defendant's motion for summary judgment because plaintiff's asthma did not prevent him from walking or playing baseball); *White v. Honda of Am. Mfg.*, *Inc*., 241 F.Supp.2d 852, 857-58 (S.D.Ohio 2003) (concluding that plaintiff was not substantially limited because her asthma affected her only when she breathed certain irritants, but could still walk, exercise, and smoke cigarettes).

Although Russell uses an inhaler and nebulizer to help control his asthma, he remains symptomatic.  Thus, the Court is not precluded from finding him disabled.  *See Bond*, 152 F. Supp. 2d at 1065-66 (finding questions of fact regarding the extent to which plaintiff's asthma affected her because, despite her use of three inhalers, a home nebulizer, and intermittent courses of medication to control her asthma, plaintiff remained symptomatic); *Serv. v. Union Pac. R.R. Co.*, 153 F.Supp.2d 1187, 1191-92 (E.D. Cal. 2001) (denying summary judgment because

11

although plaintiff's use of inhalers or hot showers reduced the duration of the plaintiff's asthma attacks, they did not lessen the limitations he faced when exposed to tobacco smoke or its residue).

NA argues that Russell is not substantially limited in breathing, and points to Dr. Winder's letter stating that Russell could work a full shift, so long as he avoided particulates in the air and took breaks. However, this letter does not document the full impact of Russell's impairment, nor does it purport to do so. It does nothing to counter the laundry list of ways that Russell claims to be limited. Based on the foregoing, the Court concludes that Russell sufficiently established a genuine issue of material fact, rending this determination a factual one best suited for a jury.

### ii. Sleeping

Russell's asthma and rheumatoid arthritis require him to sleep in a recliner nightly, and rely on a nebulizer to fall asleep occasionally. Even with these precautions, Russell wakes up every few hours, and must take daily naps. The Court finds these limitations to be much more severe than those of the average person; thus, Russell has established a genuine issue of material fact as to whether his rheumatoid arthritis and breathing substantially limit his ability to sleep. *See Sanders v. First Energy Corp.*, 813 N.E.2d 932, 937-38 (Ohio Ct. App. 2004) (holding that plaintiff established a genuine issue of material fact because he frequently woke up at night, had to nap at work, required machines to help him sleep through the night, and often fell asleep in the car and watching television).

### iii. Regarded As

To be disabled under the "regarded as" prong, a plaintiff must establish that his employer regarded him as having an impairment that substantially limits a major life activity.[1] *Moorer v.*

---

[1]

(continued...)

12

*Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 479 (6th Cir. 2005).  During his deposition, Belcher opined that Russell worked at a slower pace because he had a learning disability.  While this is direct evidence that Belcher regarded Russell as having an impairment, it is not evidence that Belcher regarded Russell as being limited in anything other than working quickly as a support manager, which is not a major life activity.  *See Seitz v. Lane Furniture Indus., Inc.*, No. 07CV171, 2008 WL 4346439, at *10 (N.D.Ohio Sept. 17, 2008).  Moreover, there is no evidence that Belcher regarded Russell as being substantially limited in working, which would require Belcher to believe that Russell could not perform a broad class of jobs.  *See* 29 C.F.R. § 1630.2(j)(3)(I) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.").  Thus, as a matter of law, NA did not regard Russell as disabled.

### b. Otherwise Qualified

To meet the second part of his *prima facie* case, Russell must show that he is able to safely and substantially perform the essential functions of his job.  *See McGlone*, 697 N.E.2d at 206.  Russell contends that he is qualified to work as a support manager, despite his inability to work multiple booth shifts a week because the booth shift is not an essential part of his job.  Thus, the

---

[1](...continued)
 Russell argues that under Ohio law, a plaintiff need only establish that his employer regarded him as having an impairment, citing *Johnson v. Metrohealth Med. Ctr.*, No. 82506, 2004 WL 1233954, at *2 (Ohio Ct. App. June 3, 2004).  As explained by other state and federal courts, however, "until the Ohio Supreme Court issues an opinion adopting the holding of the *Johnson* court, federal courts should not follow *Johnson*."  *See*, *e.g.*, *See Seitz v. Lane Furniture Indus., Inc.*, No. 07CV171, 2008 WL 4346439, at *7 (N.D.Ohio Sept. 17, 2008).  This is due to the conflicting precedent that it is "appropriate for the Court to look to federal law in determining whether [plaintiff] was disabled for purposes of his state law disability discrimination claim."  *Id.*; *See Cox v. True North Energy*, LLC, 524 F.Supp.2d 927, 943 n. 7 (N.D.Ohio 2007); *Hayest v. Cleveland Clinic Found.*, No. 1:06cv20, 2006 WL 2993415, at *2 (N.D. Ohio Oct. 19, 2006).

burden shifts to NA to establish that the booth shift is an essential job function of a support manager. *See Hamlin v. Charter Tp. of Flint*, 165 F.3d 426, 429 (6th Cir. 1999) (affirming *Monette*, 90 F.3d at 1184).

Courts examine several factors when determining whether a job function is essential, including the: (1) employer's judgment; (2) written job descriptions prepared before advertising for or interviewing job applicants; (3) amount of time spent performing the function; (4) consequences of not requiring the employee to perform the function; (5) terms of a collective bargaining agreement; (6) work experience of past employees in the job; and (7) current work experience of employees in similar jobs. 29 C.F.R. § 1630.2(n)(3); *Sanders*, 813 N.E.2d at 938-39.

To meet its burden, NA asserts that all support managers, past and present, are trained to work all four shift assignments. Allen explains that because the shifts must be covered at all times, support managers must be willing and able to work each shift in the rotation.

Russell, however, sufficiently rebutted NA's proffered evidence by showing that if Allen desired to do so, she could never schedule Russell for the booth shift. This suggests that working the booth shift is not critical to Russell's position. Further, support managers have different schedules for working the booth shift, and can switch assigned shifts if they choose to do so, distinguishing them from hospital and security personnel, where there is an overwhelming safety need for rotating shifts. *See Miller v. Dep't of Corr.*, No. 222439, 2002 WL 44417, at *4 (Mich. Ct. App. Jan. 11, 2002) (noting that federal courts have recognized that the position of a corrections officer involves rotation among several different positions and that of primary import is an employee's ability to perform the duties required of each position). Russell's case, instead,

14

more closely resembles *Kiphart v. Saturn Corp.*, 251 F.3d 573, 585-86 (6th Cir. 2001), where the Sixth Circuit found that rotation was not an essential function because members swapped tasks among themselves to satisfy personal preferences.   Based on the foregoing, the Court concludes that the question of whether the booth shift is an essential function of a support manager's job is one of fact, to be properly decided by a jury. *See Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998) ("[T]he determination of whether a given function is 'essential' within the meaning of the ADA and regulations promulgated thereunder is typically a question of fact and thus not suitable for resolution through a motion for judgment as a matter of law... .").

### c. Adverse Employment Action

To meet the third part of his *prima facie* case, Russell must show that he experienced an adverse employment action, at least in part, because of his disability.  *See McGlone*, 697 N.E.2d at 206. Russell raises a genuine issue of material fact as to whether NA terminated him, at least in part, because of his disability.  It is undisputed that Russell suffered an adverse employment action when NA terminated his employment on September 11, 2006.  *See Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (finding termination of employment to be a materially adverse employment action).

Further, Russell notes certain exchanges he had with Belcher and Allen during his tenure at Maumee to suggest that disability played a role in NA's decision to terminate Russell's employment.  For instance, when Russell gave Allen a note from his doctor to support his accommodation request, she became angry, refused to discuss his requested accommodation, and immediately responded that  "it was going to be a problem." (Russell Dep. p. 178).  Belcher refused to accommodate Russell until he received a full physical examination, something that he

15

doctor refused to administer, and also failed to respond to Dr. Gordon's request for a more specific explanation as to what he needed to do.  Moreover, NA placed Russell under a 90-day evaluation period after receiving his letter explaining that he worked at a slower pace due to his asthma and rheumatoid arthritis.  Viewed in a light most favorable to Russell, such behavior provides circumstantial evidence that Russell's disability did, in fact, play a role in NA's adverse employment action.

### 2. Legitimate Nondiscriminatory Explanation

NA meets its burden of proffering a legitimate, nondiscriminatory explanation for its decision to terminate Russell's employment.  NA contends that on September 9, 2006, Russell yelled at his supervisors, threw documents, and pounded his fists on the table, and that it terminated Russell solely because of this insubordinate conduct.  Because insubordination is a legitimate, nondiscriminatory reason for terminating an employee, the burden shifts back to Russell.  *See White v. Int'l Enter. Corp.*, No. 3:02CV7505, 2003 WL 22060545, *5 (N.D.Ohio July 23, 2003) (citing *Hood v. Diamond Prod., Inc.*, 658 N.E.2d 738, 741 (Ohio 1996) (noting that insubordination is a legitimate, nondiscriminatory reason for terminating a plaintiff's employment)).

### 3. Pretext

A plaintiff demonstrates pretext by showing that his employer's articulated, nondiscriminatory explanation: (1) has no basis in fact; (2) did not actually motivate his discharge; or (3) is insufficient to motivate the discharge.  *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  When proving pretext through the second approach, a plaintiff "attempts to indict the credibility of his employer's explanation by showing circumstances which

16

tend to prove that an illegal motivation was more likely than that offered by the defendant." *Id.* However, "mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Stembridge v. Summit Acad. Mgmt.*, No. 23083, 2006 WL 2270855, at *5 (Ohio Ct. App. Aug. 9, 2006).

Russell first contends that NA's proffered reason has no basis in fact, because he never engaged in insubordinate conduct. The conversation between Russell, Allen, and Belcher took place behind closed doors, and thus, determining which party offered a truthful account is a credibility assessment, unsuitable for summary judgment.

Although Russell's deposition testimony is uncorroborated, as opposed to Allen's and Belcher's story, Russell's explanation is not implausible. Thus, viewing the facts in the light most favorable to the plaintiff, the Court finds a genuine issue of material fact as to whether NA's stated reason is pretextual. *See Matsushita*, 475 U.S. at 586 ("If the moving party has demonstrated that the non-moving party's claim is factually implausible, then the non-moving party must produce persuasive evidence to support his claim."); *Paul v. Uniroyal Plastics*, 575 N.E.2d 484, 488 (Ohio Ct. App. 1988) ("[I]n addition to considering the amount of evidence presented on an issue, the court must consider whether the evidence makes a party's claim plausible.").

Russell also relies on the circumstantial evidence described in Section III.A.1.C, to argue that an illegal motivation was more likely than NA's explanation. By providing evidence of Belcher's and Allen's comments, Allen's refusal to discuss Russell's accommodation request, his placement under a 90-day evaluation after receiving a letter explaining that he has two disabilities, Russell has created a genuine issue of material fact as to whether a discriminatory reason was more likely than the lawful reason articulated by NA.

17

**B. Failure to Accommodate**

"An employer must make reasonable accommodation to the disability of an employee or applicant, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business." *Mitnaul v. Fairmount Presbyterian Church*, 778 N.E.2d 1093, 1100 (Ohio Ct. App. 2002) (quoting Ohio Admin. Code § 4112-5-08).

It is clear that in an ADA claim, the burden of establishing that the proposed accommodation is reasonable is borne by the plaintiff. *Gaines v. Runyon*, 107 F.3d 1171, 1883, 1186-87 (6th Cir. 1997). However, reasonable accommodation does not mandate that the employer yield to the employee's every desire, *Schmidt v. Methodist Hospital of Indiana, Inc.*, 89 F.3d 342, 344 (7th Cir. 1996), or translate to being "a perfect cure for the problem." *Stewart v. County of Brown*, 86 F.3d 107, 112 (7th Cir. 1996). "[T]he disabled individual bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Monette*, 90 F.3d 1173 at 1183. Thus, the test is whether the accommodation is objectively reasonable, *Cassidy v. Detroit Edison*, 138 F.3d 629 (6th Cir.1998), and is to be determined on a case-by-case basis.

Russell requested four different accommodations. He cannot proceed with two of these claims because NA largely accommodated his requests. First, in May, 2005, Russell requested that he work a maximum of two booth shifts a week, with at least 48 hours in between the two shifts. The record shows that Allen largely altered Russell's schedule to conform to this request. Over the course of nine months, from January, 2006 to September, 2006, Allen scheduled Russell for more than two booth shifts a week on only four occasions. Moreover, in December, 2005, Dr. Winder requested that Russell break and request help when needed. NA accommodated Russell

by authorizing him to do both.  Thus, the Court grants Defendant's motion on both of these claims

and need only examine two of Russell's accommodation requests.

In August, 2005, Dr. Winder requested that Russell use his own judgment while climbing

stairs.  Such a request is unreasonably vague and failed to "identify the precise limitations

resulting from the disability."  *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 635 (6th Cir. 1998).

That coupled with NA's eventual compliance with Russell's request for a modified booth-shift

schedule, shows that it did "all that it possibly could" to accommodate Russell under the

circumstances.  *Id.*

The Court's analysis, therefore, focuses on the one request to which NA did not comply –

Dr. Gordon's request that Russell be limited to one, five-hour booth shift a week.

To determine what accommodation, if any, is reasonable, both the employee and employer

must also engage in the "interactive process."  *Swanson v. Senior Resource Connection*, 254

F.Supp.2d 945, 961 (S.D.Ohio 2003).  Russell contends that NA failed to do so.

By all accounts, Russell and NA did not engage in an ideal interactive process.  Russell

argues that NA acted in bad faith, evidenced by NA's failure to respond to Dr. Gordon's inquiry

questioning what information it needed, exactly, to accommodate Russell.  Russell also points to

Belcher's comment that he would not accommodate Russell until Russell engaged in a full

physical evaluation.  There is also evidence, however, that Russell was responsible for the

ineffective interactive process.  Russell did not provide NA with notes from his physicians

immediately upon receiving them.  Instead, Russell retained Dr. Gordon's note for two months

and Dr. Winder's note for one month.  Moreover, despite NA's repeated request for more specific

information about his limitations, Russell never provided further clarification.

19

Even if the parties had engaged in the interactive process, it is uncertain whether Dr. Gordon's requested accommodation is reasonable. Reasonableness of an accommodation is a question of fact, best suited for a jury. *Berry v. City of Savannah*, No. 98-5112, 1999 WL 196557 at *4 (6th Cir. April 1, 1999); *Cassidy*, 138 F.3d at 634. Therefore, because genuine issues of material fact exist as to whether limiting Russell to one, five-hour booth shift a week was reasonable, the Court denies Defendant's motion for summary judgment as to this aspect of Russell's failure to accommodate claim.

### C. Retaliation

To establish a *prima facie* case of retaliation under R.C. § 4112.02(I), the plaintiff must show that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal connection existed between his protected activity and adverse action. *Chandler v. Empire Chem., Inc., v. Midwest Rubber Custom Mixing Div.*, 650 N.E.2d 950, 954 (Ohio Ct. App. 1994). If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to state a legitimate, nondiscriminatory reason for its adverse employment action. *See Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997). The plaintiff, then, bears the ultimate burden of proving that the employer's proffered reason for the action was merely a pretext for discrimination. *Id.*

Here, Plaintiff has successfully established a *prima facie* case because Plaintiff created issues of material fact as to whether: (1) he engaged in protected activity by giving Defendant information about the ADA; (2) he suffered an adverse employment action when Defendant terminated his employment; and (3) a causal connection existed between these two events due to their close temporal proximity. Although Defendant proffered a legitimate, nondiscriminatory

20

reason for Plaintiff's termination, namely, insubordinate conduct, Plaintiff sufficiently created a genuine issue of material fact as to whether that reason was pretext for unlawful discrimination. As a result, the Court denies Defendant's motion on this claim.

### 1. *Prima Facie* Case

### a. Protected Activity

Russell contends that by giving Belcher information about the ADA on September 9, 2006, and requesting a reasonable accommodation in May, 2005, he engaged in protected activities.  The Court agrees on both accounts and denies Defendant's motion on this issue.

In light of NA's failure to completely provide every accommodation that Russell and his physicians requested, Russell engaged in the protected activity of opposing an unlawful discriminatory practice when he gave NA documents about the ADA and reasonable accommodations.  *See Davis v. Flexman*, 109 F.Supp.2d 776, 802-03 (S.D.Ohio 1999) (finding that plaintiff engaged in the protected activity of opposing discriminatory conduct when she provided defendant with a copy of the ADA).

Further, Russell engaged in protected activity when he requested a reasonable accommodation in the form of reduced booth shifts.  *See Garcia v. Third Fed. Sav. & Loan Ass'n of Cleveland*, No. l:06-cv-1990, 2007 WL 1235820, at *6 (N.D.Ohio April 26, 2007) (concluding that "requesting a reasonable accommodation is protected activity for purposes of a retaliation claim" after assessing cases from other circuits).

21

**b. Adverse Employment Action**

An adverse employment action is one that results in a "materially adverse change [to] the terms and conditions of plaintiff's employment." *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). Russell asserts that he experienced an adverse employment action when NA terminated his employment on September 11, 2006, negatively evaluated his performance in June, 2005, and placed him under evaluation for 90 days in July, 2005.

First, the Court finds that Russell endured an adverse employment action when NA terminated his employment on September 11, 2006. *See Kocsis*, 97 F.3d at 886.

Russell fails to raise a genuine issue of material fact as to whether he suffered an adverse employment action when NA negatively evaluated his performance in June, 2005. Although "a negative performance evaluation does not [alone] constitute an adverse employment action," it can if "the evaluation has an adverse impact on an employee's wages or salary." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007). Russell, however, has not produced any evidence to show that the negative performance evaluation "significantly affected [his] salary or professional advancement." *Vaughn v. Louisville Water Co.*, No. 07-6234, 2008 WL 4997487, at *9 (6th Cir. Nov. 24, 2008).

Similarly, NA did not adversely affect Russell's employment by placing him under evaluation a 90-day evaluation. As with written employment evaluations, an evaluation period must be tied to an action that materially and adversely changes the terms of the employee's position to constitute an adverse employment action. *See Kinamore v. EPB Elec. Util.*, 92 Fed.Appx.197, 203 (6th Cir. 2004). Because Russell has not offered any explanation as to why

22

placement under evaluation, by itself, constitutes an adverse employment action, the Court grants NA's request for summary judgment on this argument.

### c. Causal Connection

The plaintiff must "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity," *EEOC v. Avery Dennisson Corp.*, 104 F.3d 858, 861 (6th Cir. 1997), although the "burden in establishing a *prima facie* case is not intended to be an onerous one." *Bryson v. Reigs Corp.*, 498 F.3d 561, 571 (6th Cir. 2007).

If a plaintiff can show temporal proximity between his engagement in a protected activity and an adverse employment action, he meets his burden of establishing a causal connection at the *prima facie* stage. *See*, *e.g.*, *Mickey v. Seidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (finding that three months between plaintiff's request for leave and termination satisfies the *prima facie* case of retaliation).

As such, with only two days dividing Russell's distribution of documents about the ADA and termination, Russell establishes a causal connection. *See Goller v. Ohio Dep't of Rehab. & Corr.*, 285 Fed.Appx. 250, 257 (6th Cir. 2008) (concluding that two months between plaintiff's complaint and her termination creates inference of retaliation). NA urges the Court to find otherwise; it contends that Russell gave neither Belcher nor Allen information about the ADA. As previously discussed, when construed in the light most favorable to the plaintiff, the Court finds that Russell created a genuine issue of material fact as to this assertion.

Although the Court concludes that Russell's negative employment evaluation does not constitute an adverse action, the temporal proximity between Russell's requests for a reasonable accommodation, in May, 2005, and his negative employment evaluation in June, 2005, would

23

establish a causal connection.  *See Mickey*, 516 F.3d at 525; *Bryson*, 498 F.3d at 571.  NA tries to

rebut this by arguing that Russell first requested a reasonable accommodation in August, 2005,

when he provided NA with Dr. Winder's note, and not in May, 2005.

According to the record, however, Russell requested a modified schedule due to his

physical limitations, at least once in May, 2005.  By making this request, and linking it to an

impairment, Russell sufficiently requested a "reasonable accommodation."  *See Leeds v. Potter*,

249 Fed.Appx. 442, 449-50 (6th Cir. 2007) (citing *Smith v. Henderson*, 376 F.3d 529, 535 (6th

Cir. 2004) ("While this Court has held that an employee need not use the magic words

"accommodation" or even "disability," the request does need to make it clear from the context that

it is being made in order to conform with existing medical restrictions.")).

Finally, even if the Court had determined that Russell endured an adverse employment

action when NA placed him under evaluation, this claim would still fail for lack of a causal

connection.  Russell tries to link his evaluation period with the letter he sent to Allen and Belcher

citing his disabilities as the reason for his slower pace.  Russell cannot do this.  First, Russell

never claimed that he engaged in protected activity by writing this letter.  Even if he did, however,

Allen knew of Russell's impairments before she received Russell's letter, as Russell requested a

modified shift schedule one month prior.  Thus, the Court cannot properly infer that NA placed

Russell under evaluation after discovering that he had disabilities, and grants Defendant's motion

for summary judgment as to this argument.

24

### 2. Legitimate Nondiscriminatory Explanation

NA meets its burden of proffering a legitimate, nondiscriminatory explanation for its decision to discharge Russell and negatively evaluate his performance.  NA explained that it terminated Russell's employment solely because of his insubordinate conduct during the September 9, 2006, meeting.  Because insubordination is a legitimate, nondiscriminatory reason for terminating an employee, the burden shifts back to Russell on this claim.  *See White*, 2003 WL 22060545, at *5.

Further, even if the Court found that Russell established his *prima facie* case linking his negative employment evaluation to his request for a reasonable accommodation, NA provides a legitimate, nondiscriminatory explanation.  Russell's former managers at Showcase Cinemas, not Allen, compiled his negative employment evaluation.  This belies Russell's contention that Allen negatively evaluated him after his request for a reasonable accommodation.

### 3. Pretext

As the burden shifts back to Russell, he establishes pretext rebutting NA's proffered explanation for terminating his employment, but not for his negative employment evaluation.

Russell's argument as to why NA's proffered reason for discharging him is pretextual largely mirrors his argument in Section III.A.3.  For instance, Russell contends that NA's explanation lacks basis in fact, as Russell never yelled, raised his voice, or displayed other insubordinate behavior during the meeting on September 9, 2006.  As previously determined, Russell has created a genuine issue of material fact as to whether NA's explanation for terminating his employment is pretextual.[2]   However, Russell fails to respond to NA's contention

---

[2]

 Russell also tries to prove pretext by arguing that NA did not terminate other employees who engaged in conduct similar to that of which they accused him.  Russell produced evidence that an

(continued...)

that Allen played no role in negatively evaluating his performance.  As such, the Court grants

Defendant's motion on this argument.

## IV. Conclusion

For the reasons discussed herein, except as noted herein with respect to a limited number

of issues, Defendant's motion for summary judgment (Doc. 33) is hereby denied.

IT IS SO ORDERED.

　s/ *David A. Katz*　
DAVID A. KATZ
U. S. DISTRICT JUDGE

---

[2](...continued)
employee lodged a complaint against Belcher in 2007, alleging that Belcher acted out of line and
in an unprofessional manner.  Instead of terminating him, however, NA responded by sending
Belcher to an anger management class.

This comparison fails to establish pretext because Russell and Belcher are not similarly
situated.  *See Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 378-79 (6th Cir. 2002)
(citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) ("In order
to show that an employer's proffered nondiscriminatory explanation is pretext on the grounds that
a similarly situated employee received disparate treatment for the same conduct, 'the plaintiff and
the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of
the relevant aspects.'")).  Russell allegedly displayed insubordinate conduct because he acted
inappropriately towards his supervisor.  Belcher's behavior, on the other hand, was directed
towards his supervisee.  This distinction indicates that Russell and Belcher and not similarly
situated and precludes Russell from establishing pretext on this ground.